# United States Court of Appeals
*for the*
# Eighth Circuit

Case No. 24-3450

RHONDA BURNETT; JEROD BREIT; JEREMY KEEL; FRANCES HARVEY; HOLLEE ELLIS,

*Plaintiffs-Appellees,*

– v. –

NATIONAL ASSOCIATION OF REALTORS; HOME SERVICES OF AMERICA,

*Defendants-Appellees,*

KELLER WILLIAMS REALTY, INC.; REALOGY HOLDINGS CORP.,

*Defendants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM AN ORDER OF THE U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI (KANSAS CITY), NO. 4:19-CV-00332-SRB THE HONORABLE STEPHEN R. BOUGH, JUDGE PRESIDING

## BRIEF FOR OBJECTOR-APPELLANT MONTY MARCH

MARVIN A. MILLER
MATTHEW E. VAN TINE
MILLER LAW LLC
53 West Jackson Boulevard,
Suite 1320
Chicago, Illinois 60604
(312) 332-3400

MICHAEL M. BUCHMAN
NATHANIEL BLAKNEY
MOTLEY RICE LLC
800 Third Avenue, Suite 2401
New York, New York 10022
(212) 577-0040

– and –

LOUIS M. BOGRAD
MOTLEY RICE LLC
401 Ninth Street NW, Suite 630
Washington, DC 20004
(202) 386-9623

*Attorneys for Objector-Appellant Monty March*

COUNSEL PRESS (800) 4-APPEAL • (380535)

BHH AFFILIATES, LLC; HSF AFFILIATES, LLC,

*Defendants-Appellees,*

RE/MAX LLC,

*Defendant,*

– v. –

BROWN HARRIS STEVENS; THE AGENCY,

*Intervenors-Appellees,*

– v. –

MONTY MARCH,

*Objector-Appellant.*

## SUMMARY OF THE CASE

This appeal concerns antitrust claims brought on behalf of a class of Manhattan residential real estate sellers who utilized the services of a real estate broker, and paid a buyer-broker commission in accordance with the rules and regulations promulgated by the Real Estate Board of New York ("REBNY"). This Manhattan REBNY Class has nothing to do with the unrelated nationwide class that sold residential real estate and paid a buyer-broker commission pursuant to rules established and enforced by the National Association of Realtors ("NAR").

In approving the nationwide settlement between the Plaintiff-Appellees and Defendant-Appellee NAR, the District Court ignored overwhelming evidence that the *Burnett* litigation and the REBNY actions pending in the Southern District of New York *do not* share the same factual predicate. The District Court moreover decided to impose an in-person attendance requirement upon all objectors. That Order contravened previous court approved notices, worked manifest hardships upon objectors across the country, and is without precedent.

Objector-Appellant Monty March respectfully requests twenty minutes of oral argument to address these significant errors by the District Court.



Appellate Case: 24-3450 Page: 3 Date Filed: 05/16/2025 Entry ID: 5517561

# TABLE OF CONTENTS

SUMMARY OF THE CASE ........ i

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iii

JURISDICTIONAL STATEMENT ........ 1

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 3

I. Factual Background ........ 3

II. Procedural History ........ 6

III. The District Court's Settlement Approval Order ........ 14

SUMMARY OF THE ARGUMENT ........ 18

ARGUMENT ........ 20

I. Standard of Review ........ 20

II. The District Court Abused its Discretion When it Ordered all Objectors to Appear in Person After Objectors Had Already Complied with a Prior Court Order That Did Not Require Such Attendance ........ 20

III. The District Court Erred By Holding that the Identical Factual Predicate Test Extinguished REBNY Manhattan Claims ........ 30

CONCLUSION ........ 47

# TABLE OF AUTHORITIES

## CASES

*Berry v. Schulman*,
807 F.3d 600 (4th Cir. 2015) ....................34

*Caligiuri v. Symantec Corp.*,
855 F.3d 860 (8th Cir. 2017) ....................20

*City Partnership Co. v. Atlantic Acquisition Ltd. Partnership*,
100 F.3d 1041 (1st Cir. 1996) ....................34

*Cromeans v. Morgan Keegan & Co.*,
859 F.3d 558 (8th Cir. 2017) ....................20

*Dennings v. Clearwire Corp.*,
2013 WL 3870801 (W.D. Wash. July 26, 2013) ....................28

*Dennis v. JPMorgan Chase & Co.*,
2021 WL 1893988 (S.D.N.Y. May 11, 2021) .................... 2, 39

*Freeman v. MML Bay State Life Insurance Co.*,
445 F. App'x 577 (3d Cir. 2011) ....................34

*Hesse v. Sprint Corp.*,
598 F.3d 581 (9th Cir. 2010) ....................34

*In re Auction Houses Antitrust Litigation*,
2001 WL 170792 (S.D.N.Y. Feb. 22, 2001) ....................40

*In re Auction Houses Antitrust Litigation*,
42 F. App'x 511 (2d Cir. 2002) .................... 2, 39, 40, 41

*In re BankAmerica Corp. Securities Litigation*,
350 F.3d 747 (8th Cir. 2003) ....................20

*In re Crocs, Inc. Securities Litigation*,
306 F.R.D. 672 (D. Colo. 2014) ....................29

*In re Currency Conversion Fee Antitrust Litigation*,
264 F.R.D. 100 (S.D.N.Y. 2010) .................... 43, 44

*In re Literary Works in Electronic Databases Copyright Litigation*,
654 F.3d 242 (2d Cir. 2011) ....................34

*In re T-Mobile Customer Data Security Breach Litigation*,
111 F.4th 849 (8th Cir. 2024) .................... 28, 29

*In re Train Derailment Near Amite Louisiana, on October 12, 2002*,
2006 WL 644494 (E.D. La. Jan. 27, 2006) .......... 28

*Little Rock School District v. Pulaski County Special School District No. 1*,
921 F.2d 1371 (8th Cir. 1990) .......... 20

*Litwin v. iRenew Bio Energy Solutions, LLC*,
226 Cal. App. 4th 877, 172 Cal. Rptr. 3d 328 (2014) .......... 2, 27

*Marshall v. National Football League*,
787 F.3d 502 (8th Cir. 2015) .......... 20

*Matsushita Electric Industrial Co. v. Epstein*,
516 U.S. 367 (1996) .......... 31, 33

*National Super Spuds, Inc. v. New York Mercantile Exchange*,
660 F.2d 9 (2d Cir. 1981) .......... 2, 31, 32

*Nottingham Partners v. Trans-Lux Corp.*,
925 F.2d 29 (1st Cir. 1991) .......... 34

*Olden v. Gardner*,
294 F. App'x 210 (6th Cir. 2008) .......... 34

*Shaun Fauley, Sabon, Inc. v. Metropolitan Life Insurance Co.*,
2016 IL App (2d) 150236, 52 N.E.3d 427 .......... 27, 28

*TBK Partners, Ltd. v. Western Union Corp.*,
675 F.2d 456 (2d Cir. 1982) .......... 2, 32, 39

*Thomas v. Blue Cross & Blue Shield Ass'n*,
333 F. App'x 414 (11th Cir. 2009) .......... 35

*Thompson v. Edward D. Jones & Co.*,
992 F.2d 187 (8th Cir. 1993) .......... 34

*Williams v. General Electric Capital Auto Lease, Inc.*,
159 F.3d 266 (7th Cir. 1998) .......... 34

**TREATISES**

6 *Newberg and Rubenstein on Class Actions* (6th ed.) .......... 26, 33

William B. Rubenstein, *Newberg on Class Actions* § 18.19 (5th ed. 2018) .......... 31



Appellate Case: 24-3450 Page: 6 Date Filed: 05/16/2025 Entry ID: 5517561

## JURISDICTIONAL STATEMENT

The United States District Court for the Western District of Missouri had subject matter jurisdiction over the *Burnett* litigation under the general grant of federal question jurisdiction and specific antitrust jurisdictional grants. 28 U.S.C. §§ 1331, 1337; 15 U.S.C. §§ 15, 16.

This Court has appellate jurisdiction under 28 U.S.C. § 1291. On November 27, 2024, the district court issued an order approving the settlement between Plaintiff-Appellees and Defendant-Appellee NAR, along with certain brokerage and multiple listing services ("MLSs") that had opted into the NAR Settlement (collectively the "Settling Defendants"). App. 1398, R.Doc. 1622, at 1, Add.1. Objector-Appellant Monty March—a Manhattan residential real estate seller who had objected to the NAR Settlement—filed a timely notice of appeal on December 2, 2024. App. 1486; R.Doc.1630.

## **STATEMENT OF THE ISSUES**

1. Did the District Court abuse its discretion and violate absent members' due process rights when it issued a text order requiring all objectors to appear in person at the Class Action Final Approval Hearing?

Most apposite Authorities:

U.S. CONST. AMEND. V.

*Litwin v. iRenew Bio Energy Solutions, LLC*,
226 Cal. App. 4th 877, 172 Cal. Rptr. 3d 328 (2014), *as modified* (May 29, 2014).

2. Did the District Court err when it overruled Objector-Appellant March's objection and enjoined REBNY class members from pursuing their antitrust claims involving REBNY's rules, even though March's claims lack an "identical factual predicate" with those of the *Burnett* litigation?

Most apposite Authorities:

*National Super Spuds, Inc. v. New York Mercantile Exchange*,
660 F.2d 9 (2d Cir. 1981).

*TBK Partners, Ltd. v. Western Union Corp.*,
675 F.2d 456 (2d Cir. 1982).

*Dennis v. JP Morgan Chase & Co.*,
2021 WL 1893988 (S.D.N.Y. May 11, 2021).

*In re Auction Houses Antitrust Litigation*,
2001 WL 170792 (S.D.N.Y. Feb. 22, 2001), *aff'd*, 42 F. App'x 511 (2d Cir. 2002).

## STATEMENT OF THE CASE

### I. Factual Background

Manhattan is one of the most expensive residential real estate markets in the world. App. 678, R.Doc. 1562-2, at 2. In 2018, $21.8 billion in residential real estate transactions occurred in Manhattan. In the first quarter of 2022, Manhattan real estate sales topped $7 billion. *Id.* At the same time, the average price of a Manhattan apartment soared 19% to $2,042,113. *Id.*

For over 125 years, REBNY has been the trade association for residential real estate brokers, agents, building owners, managers, and developers in Manhattan. App. 678-79, R.Doc. 1562-2, at 2-3. REBNY's membership ranks include 810 brokerage firms and 15,000 real estate professionals. *Id.*

While REBNY was originally a member of NAR, REBNY made the decision to secede from NAR over two decades ago—in 1994. App. 679, R.Doc. 1562-2, at 3; App. 655, R.Doc. 1562, at 5. REBNY's decision to separate from NAR stemmed from a years' long dispute pertaining to "the number of salespeople and brokers that REBNY members [were] required to pay dues for to the national and state [Realtor] associations." App. 655-56, R.Doc. 1562, at 5-6. In the immediate aftermath of REBNY's separation from NAR, REBNY's then First Senior Vice President Warren Wechsler emphasized, "we [REBNY] just no longer have a relationship with them [NAR]." App. 656, R.Doc. 1562, at 6.



Appellate Case: 24-3450 Page: 9 Date Filed: 05/16/2025 Entry ID: 5517561

Two years after REBNY's departure from NAR, NAR implemented a rule which required a residential real estate seller's agent to offer a blanket and nonnegotiable commission for the buyer's agent as a condition of listing residential real estate property on a local MLS (the "Mandatory Offer of Compensation Rule"), App. 565, R.Doc. 1562, at 6, the rule challenged in the *Burnett* litigation. REBNY had no involvement in NAR's decision to fashion or implement that rule. REBNY has been totally separate from NAR since 1994 and played no role in NAR's decision-making process in 1996. *Id.*

Eight years later, in 2004, REBNY created its own Residential Listing Service ("RLS") and adopted its own Universal Co-Brokerage Agreement Rules and Regulations. App. 565, R.Doc. 1562, at 6. Art. IV, §1 of REBNY's RLS Rules and Regulations ("the REBNY Broker Commission Rule") required a seller broker to *equally* share the commission established in the listing agreement with the buyer broker. App. 695, R.Doc. 1562-2, at 19.[1] This rule was distinguishable from the

---

[1] The relevant provision of the REBNY Broker Commission Rule stated as follows:

> Commissions: With respect to the sale of an Exclusive Property, if a sale is consummated with a Buyer procured by a Co-Broker, unless the Exclusive Listing specifies otherwise or absent some other written agreement between an Owner and their Exclusive Broker(s), *the Exclusive Broker and the Co-Broker shall each be paid an equal share of the commission as specified in the Exclusive Listing*.

App. 695, R.Doc. 1562-2, at 19.

NAR Mandatory Offer of Compensation Rule which *did not* require an equal commission split. REBNY RLS rules are approved and promulgated by the Residential Brokerage Division of REBNY; NAR and its rules play no role in REBNY rulemaking. App. 679, R.Doc. 1562-2, at 3.

REBNY requires that all residential Brokerage Division members must participate in and abide by the RLS rules concerning New York City residential real estate transactions. App. 692-93, R.Doc. 1562-2, at 16-17. Those rules also require each residential real estate broker, associate real estate broker and/or real estate salesperson associated with a Residential Brokerage Division member of REBNY to become a REBNY member. App. 692-93, R.Doc. 1562-2, at 16-17.

RLS brokers and agents were also required to abide by a corollary rule which reinforced the Broker Commission Rule. That rule, entitled "Negotiations Involving Reductions in Commissions," provided:

> <u>Negotiations Involving Reductions in Commissions</u>: Any negotiation of the reduction of a brokerage commission must be done with both the Exclusive Broker [i.e., the Seller Broker] and the Co-Broker's [i.e., the Buyer's Broker] written approval of a commission reduction. If the Exclusive Broker negotiates a reduced commission with the Owner [i.e., the Seller] without the written approval of the Co-Broker, the

> Exclusive Broker must absorb the full amount of the commission reduction.

App. 696, R.Doc. 1562-2, at 20.[2]

In contrast to the REBNY rules, residential real estate commissions outside REBNY New York were fixed through NAR member brokers' policies and conduct at the corporate level which enforced the NAR buyer-broker commission requirement on NAR MLS's at the broker/agent level. *See* App. 192-93, 195-96, R.Doc. 38, at 3-4, 6-7; *see also* App. 536, R. Doc. 1560, at 6. In no uncertain terms, the NAR-based "conspiracy worked because [Defendants] required their franchisees and affiliates to belong to NAR and follow its rules. Defendant-Appellees also trained their franchisees and affiliates to make offers of buyer compensation, usually at a particular level." Br. of Pl.-Appellees at 53, *Burnett et al. v. NAR et al.*, Nos. 24-2143, 24-2168, 24-2391 (8th Cir. Dec. 11, 2024).

## II. Procedural History

Monty March has been litigating his class action against REBNY Manhattan based defendants for over a year. That action—styled *Monty March v. Real Estate Board of New York, Inc.*, CA No. 1:23-CV-09995-JGLC-RWL (S.D.N.Y) ("*March*

[2] REBNY's Code of Ethics and Professional Responsibility mirrored the reduction in commission rule by providing "[a]ny negotiation of brokerage commissions must be done with each co-brokerage firm's approval of the commission reduction. If a co-broker negotiates a reduced commission without the approval of a cooperating broker, the negotiating broker must absorb the full commission reduction." App. 697, R.Doc. 1562-2, at 21.

Action" or "*March*")—seeks antitrust class action damages for violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; New York state antitrust law (New York General Business Law § 340); and New York unjust enrichment law. App. 677, R.Doc. 1562-2, at 1.

Plaintiff-Appellees[3] and Defendant-Appellees[4] have been litigating their real estate commission litigation against NAR and its members—styled *Burnett v. National Ass'n of Realtors*, CA No. 19-cv-332-SRB (the "*Burnett* Action")—separately from any REBNY-based action. The *March* Action was the first class action in the country filed against REBNY and its brokers concerning Manhattan residential real estate transactions.

While the REBNY Manhattan litigation was in its infancy, counsel for Plaintiff-Appellees in the related *Gibson* litigation made a motion to centralize pretrial discovery before the Judicial Panel on Multidistrict Litigation ("JPML"), arguing that the primary justification for centralization was the district court's "oversight over and administration of preliminary approved nationwide settlements," "releases," and a preliminary approval order that "enjoined additional related suits." *See* Br. of Objector-Appellant at 11-12, *Burnett et al. v. NAR et al.*,

---

[3] Plaintiff-Appellees refers to the named Plaintiffs in the *Burnett* litigation: Rhonda Burnett; Jerod Breit; Jeremy Keel; Frances Harvey; and Hollee Ellis

[4] Defendant-Appellees in this appeal are: National Association of Realtors; Home Services of America; and BHH Affiliates, LLC

No. 24-2143, (8th Cir. Oct. 09, 2024) (citing Pls.' Opening Br. in Supp. of Mot. for Centralization at 11, *In re Real Estate Comm'n Antitrust Litig.*, MDL-3100 (J.P.M.L. Dec. 27, 2023)).

The JPML heard a torrent of opposition from REBNY litigants, both plaintiffs and defendants.[5] Virtually all of the REBNY Defendants agreed that the REBNY conspiracy was factually distinct from the alleged NAR conspiracy.[6]

In its written opposition to centralization, for example, REBNY itself told the JPML:

- "Unlike each of the other Defendants…REBNY and RLS have no affiliation with the National Association of Realtors ("NAR"), and do not use the NAR Rules, the NAR Handbook on Listing Policy (the "NAR Handbook"), or the NAR Code of Ethics. Tellingly, NAR is not named as a Defendant in *March*, which is premised solely upon REBNY's and RLS's own rules, *and does not implicate any NAR rules.*";

- "The NAR cases, including the *Burnett* and *Moehrl* cases…are premised entirely upon NAR's Rules, the NAR Handbook and NAR's Code of Ethics – all of which REBNY and RLS deliberately never adopted and do not follow.";

- The RLS "never maintained the 'Buyer Broker Compensation Rules'—at the heart of the NAR cases—which require a listing broker to make a mandatory blanket offer of compensation to buy-side brokers in order to list a property on the RLS;

---

[5] Order Denying Transfer at 3, *In re Real Estate Commission Antitrust Litig.*, MDL-3100 (J.P.M.L. Apr. 12, 2024) (identifying REBNY litigants opposed to centralization), attached as Ex. 1 to Motion to Supplement the Record filed by Objector-Appellant March on May 5, 2025.

[6] *See* App. 538, R.Doc.156, at 8.

- "[T]he overwhelming majority of properties sold in New York City involve co-operative and condominium apartments, not single family homes. Thus, the types of transactions over the RLS differ significantly from those on traditional MLSs outside of New York City, which involve single family homes.";

- "REBNY and RLS have no affiliation with NAR, and they have not adopted NAR's Rules, the NAR Handbook or NAR's Code of Ethics. To the contrary, REBNY and RLS maintain their own rules (which March attached to his Complaint) and their own code of ethics…March is premised upon a specific REBNY rule that materially differs from the NAR Rules, NAR Handbook and Code of Ethics at issue in the other cases Movants seek to consolidate."; "*March* and *Friedman* are premised upon an entirely different rule than the NAR Cases, which necessitates separate and distinct factual discovery. Discovery obtained from NAR, or even from NAR-affiliated associations, NAR-affiliated MLSs, and/or NAR-affiliated brokerage defendants related to jurisdictions in which such entities operate, will have absolutely no bearing whatsoever on the claims against REBNY or RLS. The inverse is also true; discovery obtained from REBNY and RLS will only relate to New York City and to the RLS in particular, which is the only listing service in the country which utilizes its rules and regulations, and thus will not create any efficiencies in the NAR Cases, which do not involve New York City, REBNY or RLS."; and

- "[B]ecause they are not affiliated with NAR, neither REBNY nor the RLS subscribe to or abide by the NAR Handbook or the NAR Code of Ethics—REBNY and RLS actually utilize their own rules and regulations and an unrelated Code of Ethics and Professional Practices." App. 955-60, R.Doc. 1562-5, at 1-6.[7]

[7] REBNY's counsel made similar representations in his oral presentation to the JPML. *See* App. 942-43, R.Doc. 1562-4, at 29-30:

- "Since [REBNY RLS's] inception in 2004, it has never utilized NAR rules;"
- "The entire [REBNY RLS] system has operated independent of NAR for its entire existence;"

Three other appellees here, who were also defendants in the REBNY lawsuits—Brown Harris Stevens Residential Sales, LLLC, the Agency, and Serhant LLC—likewise told the JPML that there was no factual overlap between the REBNY and NAR litigations:

Brown Harris Stevens represented:

- "BHS, along with other defendants to the *March* and *Friedman* Actions…are members of [REBNY], which has its own unique rules, constitution, and listing exchange [the RLS], and thus are not party to rules promulgated by NAR that are the subject of the NAR Actions;"

- "[T]he REBNY Actions present a different context in which the alleged antitrust violations will be adjudicated. The distinctions between NAR and REBNY and the brokerage firms that operate thereunder are significant;"

- "[T]he REBNY rule that is the gravamen of the REBNY Actions differs significantly from the NAR rule that is the focus of…the NAR Actions… This NAR rule—and its functional equivalent which was adopted by the remaining MLSs—is the gravamen of the NAR actions and **does not** appear in any form in REBNY's rules…the REBNY Actions do not utilize the NAR rule or have a functional equivalent to the NAR rule at issue in the NAR Actions"; and

---

- "There are no common facts and there's going to be no common discovery with respect to the two New York actions. For example, any discovery relating to the history of the NAR rules the passage of the NAR rulings, the compliance and enforcement of the NAR rules is completely irrelevant to the REBNY cases. Similarly, the passage of the REBNY rules, the enforcement and compliance with the REBNY rules, also completely irrelevant to the NAR cases;" and
- "[T]he rule at the heart of the REBNY action, Article 4, Section 1, is not a mandatory offer of compensation rule. It doesn't require an offer of compensation in order to list."

- “Quite simply, there is no conspiracy or agreement to follow NAR amongst the defendants in the REBNY Actions” App. 1291-95, R.Doc. 1562-10, at 2-6.

The Agency defendants, while referencing REBNY’s JPML brief, emphasized: “there are distinctions between NAR’s Rules, Code of Ethics and Handbook and REBNY’s Rules and Code of Ethics…[which are] meaningful and significantly distinguish the *March* and *Friedman* Actions from both the W.D. Mo. Actions and the NAR Cases. App. 1312, R.Doc. 1562-11, at 6. Moreover, Serhant LLC represented the following, that “the *March* and *Friedman* cases do not involve common questions of fact with the cases pending in the different districts[.]”App. 1284, R.Doc. 1562-9, at 2.

Following this litany of statements evincing that the New York REBNY cases did not share any factual predicate with the NAR actions, JPML Judge Kennelly asked REBNY’s counsel, “there’s been a whole succession of folks who’ve gotten up and basically said, well, we don’t follow the NAR rules, *et cetera*, *et cetera*. Isn’t there some rule that’s being followed in all these situations that has some degree of similarity or overlap with the NAR rule?” App. 944, R.Doc. 1562-4, at 31. Counsel for REBNY responded, “Not with respect to the REBNY case.” *Id.*

On the basis of all of these submissions and testimony, the JPML concluded that “Section 1407 centralization [was] not necessary at th[at] time for the



Appellate Case: 24-3450 Page: 17 Date Filed: 05/16/2025 Entry ID: 5517561

convenience of the parties and witnesses or to further the just and efficient conduct of the litigation." Motion to Supplement the Record filed by Objector-Appellant March on May 5, 2025, Ex. 1 (Order Denying Transfer at 3).

Following the JPML's order denying transfer, and with Objector-Appellant's REBNY Manhattan claims pending, Plaintiff-Appellees finalized a nationwide class settlement with Defendant-Appellee NAR. That Settlement, and the related Opt-In Settlements, were the third round of settlements[8] seeking to resolve, on a nationwide basis, claims involving a conspiracy perpetrated by and through NAR to inflate buyer-broker commissions for homes listed by NAR-affiliated "Realtors" outside of New York City on NAR-affiliated MLSs, pursuant to NAR rules and/or MLS rules that were controlled or influenced by NAR. App. 244-51, R.Doc. 759, at 2-9.

The record of the proceedings involving the NAR conspiracy do not support the release of claims involving REBNY and the RLS. NAR itself acknowledged that REBNY New York is wholly dissimilar from NAR when it opposed class certification in *Moehrl v. National Ass'n of Realtors*, No. 1:19-cv-01610 (N.D. Ill.)

---

[8] Objector-Appellant also objected to the second round of settlements with Defendants Compass, Inc.; At World Properties LLC; Douglas Elliman, Inc.; and Engel & Volkers New York Real Estate LLC. Objector-Appellant's companion appeal—captioned *Gibson v. Monty March*, No. 24-3478—relates to those settlements.

(the "*Moehrl* Action"), going so far as to describe REBNY/RLS as a service "unaffiliated with NAR and that serves the New York City area." App. 576, R.Doc. 1560-2, at 16.

The NAR Settlement Agreement, Plaintiffs' motion for preliminary approval, and the Court's Preliminary Approval Order implicitly acknowledged *the lack of a common factual predicate* between REBNY New York and the NAR litigations since they make no mention of REBNY or REBNY RLS at all. *See* App. 323-52, R.Doc. 1458, at 1-30; App. 361-469, R.Doc. 1458-1, at 8-116; App. 470-77, R.Doc. 1460, at 1-8. The Long Form Notice associated with the NAR Settlement, however, did evince an intent to release claims relating to REBNY and the RLS.[9]

Objector-Appellant March subsequently objected to the nationwide class action settlement with NAR insofar as it purported to release claims involving REBNY on behalf of himself and a putative class of persons who sold Manhattan residential real estate listed on the REBNY RLS, utilized the services of a broker, and paid a buyer broker commission in accordance with REBNY rules. App. 651, R.Doc. 1562 at 1. Mr. March argued that the nationwide class action settlement between Plaintiff-Appellees and Defendant-Appellee NAR improperly released

[9] *See* App. 516, R.Doc. 1519-1, at 1. *See also* App. 171, R.Doc. 1521 (granting Motion to Approve Form of Notices; text only entry on docket).

claims from the Manhattan REBNY litigation which *do not arise out of the same factual predicate* as the NAR litigations. App. 655-65, R.Doc. 1562, at 5-15 (emphasis added). Mr. March emphasized that no identical factual predicate could exist because REBNY separated from NAR and created its own materially different residential real estate commission sharing rules., App. 655-59, R.Doc. 1562, at 5-9. Moreover, Mr. March identified the deluge of public statements and judicial admissions before the JPML from the REBNY Manhattan Defendants that clearly showed no identical factual predicate existed between REBNY New York and residential real estate markets elsewhere. App. 661-65, R.Doc. 1562, at 11-15.

## III. The District Court's Settlement Approval Order

The district court held a fairness hearing on the proposed NAR settlement on November 26, 2024. One day later, the District Court entered an Order which overruled all of Mr. March's objections and granted final approval to the NAR Settlement, *see generally* App. 1398, R.Doc. 1622, Add. 1.

The District Court certified a settlement class (which included REBNY Manhattan residential real estate transactions) from October 31, 2019 to the date of Class Notice. App. 1401-02, R.Doc. 1622, at 4-5, Add. 4-5. The District Court further found that the NAR Settlement was fair, reasonable, and adequate—pursuant to Fed. R. Civ. P. 23(e)(2)—including as to the REBNY plaintiffs, on the grounds that the Settlement Class Representatives and Class Counsel adequately

represented the Class; the NAR Settlement was conducted at arm's length; the relief for the Class was fair and adequate; and Class members were treated fairly and equitably relative to each other. App. 1405-09, R.Doc. 1622, at 8-12, Add. 8-12. Thereafter, the Court determined that the four *Van Horn* factors supported settlement approval because: (1) there were significant risks in Plaintiffs' case; (2) Settling Defendant's financial condition impacted its ability to satisfy a judgment; (3) considerable litigation complexity remained; and (4) there was not much opposition to the settlement relative to the size of the nationwide class. App. 1406, 1410-12, R.Doc. 1622, at 9, 13-15, Add. 9, 13-15. The Court further noted that the practice changes obtained by the NAR Settlement supported granting final approval. App. 1412, R.Doc. 1622, at 15, Add. 15.

The Court next proceeded to overrule all the objections before it. App 1412-13, R.Doc. 1622, at 15-16, Add. 15-16. The Court alluded to its text Order that "all objectors and their attorneys . . . appear in person at the November 26, 2024, hearing at 1:30P.M. to argue their Objections." App. 1332, R.Doc. 1566. The Court asserted that "[t]his order is within the Court's discretion, particularly in light of the recent events in these cases that necessitated such appearances." App. 1413, R.Doc. 1622, at 16, Add. 16. In conclusion, the Court held that "[a]ll Objectors who did not appear in person failed to comply with the Court's order. Therefore, all objection[s] filed by . . . Objectors who did not appear in person at

the November 26, 2024, Final Settlement Hearing, are waived for failing to comply with the Court's Order." App. 1413-15, R.Doc. 1622, at 16-18, Add. 16-18.

The District Court thereafter overruled Mr. March's objections on the merits. App. 1449-56, R.Doc. 1622, at 52-59, Add. 52-59. The Court found an identical factual predicate existed between REBNY New York and the *Burnett* Litigation for various reasons. *First*, each person or entity released under the NAR Settlement had a NAR affiliation because a released brokerage needed to have at least one Principal with membership in NAR. App. 1450, R.Doc. 1622, at 53, Add. 53. *Second*, the Court accepted as true an identical factual predicate existed between REBNY New York and the *Burnett* Litigation because: (1) the NAR Settlement emanating from the *Burnett* Litigation released claims alleged in the *Gibson* litigation; (2) an Amended Complaint in *Gibson*, filed after Mr. March filed his Complaint in the Southern District of New York, alleged NAR's anticompetitive constraints applied to non-NAR MLSs; (3) the Amended *Gibson* Complaint alleged that Defendants' conspiracy had anticompetitive effects nationwide; and (4) there were 17,000 NAR members in the New York City area. App. 1450-51, R.Doc. 1622, at 53-54, Add. 53-54. *Third*, the District Court chose to ignore the litany of judicial admissions from the REBNY New York Defendants before the JPML that the REBNY brokerage rules were separate and independent from NAR's buyer commission rules. App. 1451, R.Doc. 1622, at 54, Add. 54.

*Fourth*, the Court determined—based on expert report excerpts—that "(i) the REBNY RLS rules . . . were anticompetitive in similar ways to the challenged NAR rules . . . and (ii) the challenged NAR rules applied nationwide, including to transactions in REBNY RLS." App. 1451-53, R.Doc. 1622, at 54-56, Add. 54-56.[10] In all, the Court found "the challenged REBNY rules share a common nucleus of operative fact, and thus the same factual predicate, as *Burnett* and *Gibson*" and that "claims involving properties listed on non-NAR MLSs like . . . REBNY's RLS all share the same factual predicate as those involving properties listed on NAR-affiliated MLSs." App. 1453-54, R.Doc. 1622, at 56-57, Add. 56-57.

Lastly, the District Court added that the vast majority of class members from New York favored approval of the settlements. App. 1456, R.Doc. 1622, at 59, Add. 59. That conclusory statement was based on the fact that 14,890 New York State residents had already filed claim forms. Notably, there was no indication of how many residents from New York City, where REBNY operates, filed claim forms or otherwise supported the settlement. *See id.*

Given the multitude of infirmities in the District Court's Final Approval Order, Objector-Appellant March timely filed a notice of appeal on December 2, 2024. App. 1486, R.Doc. 1630.

[10] This conclusion was directly contradicted by innumerable statements, cited above, that the NAR rules do not apply to transactions on the REBNY RLS.

## SUMMARY OF THE ARGUMENT

The District Court erred in two principal respects. *First*, it exceeded its authority and abused its discretion when it rejected Mr. March's objection to the settlement because he could not appear in person in Missouri for the Fairness Hearing. *Second*, the Court erred when it found the existence of an identical factual predicate between the claims in the REBNY litigation involving Manhattan residential real estate and the *Burnett* litigation.

The District Court erred in requiring ***all*** objectors to appear in person after it had previously approved notices that collectively apprised class members nationwide that they did not need to attend the Fairness Hearing. The issuance of the court Order requiring in person attendance was done following the objection deadline and via a PACER text order. Notice of that order was not sent to purported members of the class, like the underlying Class Notices and Preliminary Approval Order had been. The rationale for imposing such a requirement upon all nationwide objectors was highly dubious. The Court's stated justification does not pass muster as the Judge described a purely personal issue regarding correspondence from a non-objector as necessitating all putative class members' personal attendance. Such an order is also violative of objectors' due process rights. Counsel for the REBNY Manhattan class is unaware of a single court order mandating the personal attendance of all objectors following the issuance of a

preliminary approval order and court approved notices which explicitly state the contrary. The District Court's appeal to authority likewise provides no support for its puzzling order.

Additionally, in deciding that the New York REBNY litigations share an identical factual predicate with *Burnett*, the District Court turned a blind-eye to the overwhelming facts and evidence showing that REBNY operatives in an entirely different real estate ecosystem. Manhattan REBNY class members sold residential real estate using different brokers and brokerages under the different rules and regulations of an entirely separate and distinct real estate trade association that promulgated a materially distinguishable real estate commission sharing rule along with a different code of ethics. That is far from an identical factual predicate.

# ARGUMENT

## I. Standard of Review

The Eighth Circuit reviews orders approving global class action settlements over objections for abuse of discretion. *In re BankAmerica Corp. Sec. Litig.*, 350 F.3d 747, 752 (8th Cir. 2003); *Caligiuri v. Symantec Corp.*, 855 F.3d 860, 863 (8th Cir. 2017). When reviewing for abuse of discretion, appellate courts "ask whether the District Court considered all relevant factors, whether it was significantly influenced by an irrelevant factor, and whether in weighing the factors it committed a clear error of judgment." *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015) (quoting *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 921 F.2d 1371, 1391 (8th Cir. 1990)).

The Eighth Circuit reviews *de novo* district court interpretations of class settlements, including interpretations of releases. C*romeans v. Morgan Keegan & Co.*, 859 F.3d 558, 566 (8th Cir. 2017).

## II. The District Court Abused its Discretion When it Ordered all Objectors to Appear in Person After Objectors Had Already Complied with a Prior Court Order That Did Not Require Such Attendance

Objector-Appellant March complied with the District Court's Preliminary Approval Order and relied on the relevant provision of the Class Action Notice. Only after Mr. March's Objection was filed, did the Court impose an in-person attendance requirement upon ***all*** Objectors.

Nowhere within the NAR Settlement Agreement is there a requirement that an objector appear in person. *See generally* App. 361, R.Doc. 1458-1, at 8-116. The Order Preliminarily Approving the NAR Settlement similarly states, "[a]ny Settlement Class Member who complies with the requirements of this paragraph may object to any aspect of the proposed Settlement Agreement either on his or her own or through an attorney hired at his or her expense. App. 474-75, R.Doc. 1460, at 5-6. Nowhere in that paragraph or the next was there any requirement that an Objector appear in person at the Fairness Hearing. *See* App. 474-75, R.Doc. 1460, at 5-6.

The Long Form Notice likewise did not contain any mention of an in-person appearance requirement. That Notice explicitly stated, "[i]f you are a Class Member, you can object to this Settlement if you do not like any part of it . . . . You can give reasons why you think the Court should not approve it. The Court will consider your view. To object, you must file or send a written objection to the Court, as instructed by the Court, by October 28, 2024 or you will waive your right to object . . . ." App. 526, R.Doc. 1519-1, at 11. Additionally, the Long Form Notice apprised putative class members that "[y]ou will be represented by Class Counsel at the Fairness Hearing unless you choose to enter an appearance in person or through your own counsel." App. 528, R.Doc. 1519-1, at 13. Moreover, that Notice, explicitly told all class members that they *did not* need to come to the

Fairness Hearing in order for their Objection to be heard. Specifically, when the question "Do I have to come to the hearing?" was posited in the FAQ section of the Notice, the following answer was given:

> **No.** Class Counsel will represent the Settlement Class at the Fairness Hearing, but you are welcome to come at your own expense. ***If you send any objection, you do not have to come to Court to talk about it.*** As long as you filed and mailed your written objection on time, the Court will consider it. You may also pay your own lawyer to attend if you wish.

*Id.* (emphasis added). Objector-Appellant March relied on the District Court's Preliminary Approval Order along with Court approved Notices when he submitted his objection with the assurances that his personal appearance at the Fairness Hearing was ***not*** required.

After Objections to the NAR Settlement were filed, on November 4, 2024, the District Court entered a text Order on PACER which stated, "the Court ORDERS all objectors and their attorneys to appear in person at the November 26, 2024, hearing at 1:30 PM to argue their objections. Failure to comply with a Court's order can result in an objection being struck or waived." App. 1332, R.Doc. 1566. The Court pronounced in its Final Approval Order of the NAR Settlement that "[t]his order is within the Court's discretion, particularly in light of the recent events in these cases that necessitated such appearances." App. 1413, R.Doc. 1622, at 16, Add. 16.

The events which purportedly necessitated every single objector to appear in person were revealed in the Court's Fairness Hearing in the *Gibson* litigation. There the Court stated:

> There's obviously been a little bit of concern about my order that any objectors show up in person, and I wanted to provide you and more importantly the Eighth Circuit the rationale for that. As you may recall from the prior settlement approval hearing, we got a somewhat – I got a somewhat alarming objection that accused me of criminal acts, and so turned that over to the U.S. Attorney.
>
> As you can imagine, based upon my presence here today, I've not been charged with any particular federal crimes, and the generously call it correspondence from that objector has continued privately and publicly to me and some of my peers and some of my peers in the Article III up to the Eighth Circuit.
>
> So I'm now at a point that I have to turn those over to the United States Marshals. So as you can imagine, I'm somewhat suspect about objectors in this case given fact that I have to have the U.S. Marshals monitoring that correspondence. So for those reasons and others concerned about objectors, I'm assuming the vast majority of these objectors are folks that are not like that; that is not what we're dealing with. And we have good lawyers representing many of those people.
>
> So I'm not lumping everybody into that category, but forgive me if I'm a little suspect in this particular matter given when I got to turn over information to the U.S. Attorney's Office because of accusations of federal crimes.
>
> So that's the basis for why I entered that prior order.

Tr. of Final Approval of Settlement Hr'g Held Oct. 31, 2024, at 3-4, *Gibson et al. v. Nat'l Ass'n of Realtors et al.*, CA No. 23-cv-00788-SRB, attached as Ex. 2 to

Motion to Supplement the Record filed by Objector-Appellant March on May 5, 2025.[11]

It was an abuse of discretion for the District Court to flatly contradict its prior Preliminary Approval Order and Court approved Notices (which collectively told objectors they did not have to appear in person) so as to investigate and/or address a purely personal situation. It is also unclear how applying the Court's powers of compulsion to ***all*** objectors in a nationwide class action would do

---

[11] The "objector" that the Court is referring to is almost certainly Mr. Anthony Phillips. This is based on the Court's reference in the Gibson Settlement Fairness Hearing to "[a]s you may recall from the prior settlement approval hearing…" and the Court's statement from the first settlement approval hearing in *Burnett* where the Court notes, "Mr. Phillips also references sending [his allegations] on to the U.S. Attorney, the Department of Justice, and the FTC; and so I beat him to the punch and sent it on to Teresa Moore downstairs, our U.S. Attorney, so that she can do what law enforcement needs to do for judicial ethics." App. 483, R.Doc. 1492, at 6. The conclusion was made by fellow *Burnett* Objector Professor Tanya Monestier. *See* App. 1341, R.Doc. 1575, at 6 (stating Professor Monestier is "confident [the District Court] is referring to Mr. Anthony Phillips as the 'objector' sending the correspondence…[t]o be clear, Mr. Phillips is *not an objector*. He is a realtor—i.e., a member of NAR (the defendant).") (emphasis in original). That connection was also made by RISMedia—a real estate news and media site. *See id.* (citing RISMedia, *The Four Biggest Takeaways from the Copycat Settlement Approvals*, https://ace.rismedia.com/2024/11/07/the-four-biggest-takeaways-from-the-copycat-settlement-approvals/ ("[Judge] Bough appeared to be referring to Anthony Phillips, a broker in Nevada, who back in May objected to separate settlements in the Burnett case…")). Mr. Phillips, however, is identified in his court filing as "a real estate practitioner and concerned citizen" App. 298, R.Doc. 1455, at 1. He was thus not a member of the class and not a proper objector. As a real estate practitioner Mr. Phillips lacked standing to object to *any* of the Settlements before the District Court.

anything to redress accusations made by a single party who was not a proper objector to the Settlement. Perhaps even more troubling is the fact that the Court explicitly stated as to all proper objectors that their objections are "a little suspect in this particular matter given [his experience with Mr. Phillip's accusations]." *See* Ex. 2. at 4. If the Court is skeptical about objectors writ large because of the outlandish statements of a single real estate practitioner—who was not a proper objector—then the Court should have disqualified itself from the case.[12]

Objector-Appellant March relied on the District Court's Preliminary Approval Order and Court approved notices to his detriment. Had he been told before filing his objection that his personal appearance in Missouri would have been required a couple days before the Thanksgiving holiday he could have planned accordingly and been better positioned to attend. Here, not only did the Court change the rules of the game midstream when it issued its text order, but that

[12] *See* Code of Conduct for U.S. Judges, Canon 3(c)(a) (stating a "judge [having] a personal bias or prejudice concerning a party" merits disqualification from a case when "judge's impartially might reasonably be questioned[.]"). Recusal may also be merited since it has recently come to light that Mathew Dameron contributed to the District Court Judge's wife's political campaign. *See* Reply Suggestions in Supp. of Defs. Hanna Holdings, Inc. & Berkshire Hathaway Energy Cos.'s Joint Mot. for Recusal of the Hon. Stephen R. Bough at 3, *Gibson v. Nat'l Ass'n of Realtors*, CA No. 23-cv-00788-SRB (Apr. 7, 2025), attached as Ex. 3 to Motion to Supplement the Record filed by Objector-Appellant March on May 5, 2025. Mr. Dameron was counsel to Plaintiff-Appellees and his firm remains counsel to Plaintiff-Appellees. *Id.* at 1.

order was merely placed on the docket as a text order. In stark contrast, the Preliminary Approval Order and the Notices (which explicitly told objectors they did not need to appear in person at all) were widely disseminated and available for putative class members to view.

The District Court's decision to change the rules of the game midstream and require absent class members to personally attend a Fairness Hearing deprived putative class members of their due process rights under the Fifth Amendment of the Constitution. *See* U.S. Const. Amend. V. Counsel for the REBNY Manhattan class is unaware of a single instance where a Court has issued fulsome notice that personal attendance is not required and then changed course through the issuance of a text order. In fact, requiring objector attendance at a Fairness Hearing at all is virtually unheard of and has been deemed violative of due process. Professor William Rubenstein—the Harvard Law Professor and co-author of the leading treatise *Newberg and Rubenstein on Class Actions*—noted in his sworn declaration in *Fitzgerald Farm LLC v. Chesapeake Operating LLC* that "[p]rior to reviewing [the settlement in question], in nearly 30 years of practicing, teaching, and writing about complex litigation, I had never seen a provision requiring class members to appear personally at a fairness hearing so as to register an objection to a proposed settlement." App. 1376, R.Doc. 1575, at 21. And, in the most apposite case to confront this issue, a state court in California found requiring objectors to appear in

person was unconstitutional. *Litwin v. iRenew Bio Energy Sols., LLC*, 226 Cal. App. 4th 877, 883-4, 172 Cal. Rptr. 3d 328, 332 (2014), *as modified* (May 29, 2014). The *Litwin* Court stated:

> Here, the notice explicitly informed class members "[i]f you send an objection, you or your attorney will need to come to Court to talk about it or the Court will not consider it." Requiring class members in a nationwide class or even a statewide class to appear at the final approval hearing or hire an attorney to have their objections heard works a hardship on objectors, as the benefit to the objector from the class action may be so low that it would be cost prohibitive or physically challenging to personally assert one's rights at a hearing in a potentially distant location. For example, here appellant indicated he was unable to attend the hearing because it was prohibitively expensive for him to do so as an out-of-state class member. In contrast, if an objector is permitted to file written objections to be considered, the burden on the court to review them is minimal and the cost to the parties remains the same. Requiring any objector to attend the final approval hearing does not offer a meaningful opportunity to be heard, and therefore violates class members due process rights.

*Id*.

In a vain attempt to buttress its position, the District Court cites a multitude of inapposite cases in its Final Approval Order. The Court first cites *Fauley v. Metropolitan Life Insurance Co.* for the proposition that "'requiring class members to be present in court to object did not violate their due process rights' when the Court ordered 'if you want the Court to consider your objection, then you must appear at the final approval hearing.'" *See* App. 1413, R.Doc.1622, at 16, Add. 16. In that case, however, the class action notice itself stated, "if you wish to object to the settlement . . . you must appear at the Court hearing . . . " *Shaun Fauley, Sabon,*

*Inc. v. Metro. Life Ins. Co.*, 2016 IL App (2d) 150236 ¶¶ 8-9, 52 N.E.3d 427, 432-33. The objectors in *Fauley*, therefore, knew when they filed their objections that they would be required to appear in person.

The District Court next cited *In re Train Derailment Near Amite Louisiana* as support for requiring in-person attendance, but that is incorrect. The class notice in that case expressly told class members that "[e]very written objection to the proposed settlement filed in compliance with this Order will be considered by the Court regardless of whether the objector has or has not asked to be heard at the Fairness Hearing." *See In re Train Derailment Near Amite La., on Oct. 12, 2002*, 2006 WL 644494, at *2 (E.D. La. Jan. 27, 2006). Only objectors who desired to speak at the Fairness Hearing were required to appear in person. *Id.* (class notice stated "[t]o preserve the right to be heard at the Fairness Hearing in opposition to the settlement, the objecting Class Member must appear at the federal court in person…). An objector there did not waive their objection by not attending. *Id.*

The next two cases cited by the District Court, *Dennings v. Clearwire Corp.* and *In re T-Mobile Customer Data Security Breach Litigation*, are also distinguishable because both involved sanctionable conduct by objectors. *Dennings* involved a pair of serial objectors who had failed to comply with the district court's bonding order which led to the court ordering objectors' counsel (not the objectors themselves) "to appear and show cause why Objectors and their attorneys

should not be sanctioned for failing to comply with the court's order." 2013 WL 3870801, at *2 (W.D. Wash. July 26, 2013). *T-Mobile* similarly involved a litany of case-specific behavior by an objector that "was deserving of sanction." 111 F.4th 849, 858 (8th Cir. 2024). Namely, the objector in question "initially said that she was acting pro se, but she later disclosed that she was indeed represented by an attorney. She…refused to disclose her attorney's identity even though the class notice that she received required her to do so. She also evaded personal service of a subpoena compelling her to sit for a deposition. *Id.* Thus, neither case supports a requirement that all objectors must appear in person.

The District Court's final two citations, *Ferron v. Kraft Heinz Food Co.* and *In re Crocs, Inc. Securities Litigation*, are likewise inapposite. *Ferron* dealt with an objector who failed to appear at the final approval hearing ***after notifying the court of his intention to appear***. *See* App. 1414, R.Doc. 1622, at 17, Add. 17. And *In re Crocs* involved an objector who had failed to comply with requirements that each written objection include "a representation as to whether such Person or entity intends to appear to be heard at the Settlement Hearing [and] proof of all purchases, acquisitions or sale of Crocs securities during the Settlement Class Period." 306 F.R.D. 672, 682–83 (D. Colo. 2014) (alteration in original). By contrast, there is no suggestion here that Objector-Appellant March's objection was deficient in any respect.



Appellate Case: 24-3450 Page: 35 Date Filed: 05/16/2025 Entry ID: 5517561

In short, none of the cases cited by the District Court address whether or not it was proper for a court to compel an objector to attend a Fairness Hearing, especially after said objector was previously told otherwise via class action notices. That is because no such legal authority exists. It was, therefore, error for the District Court to conclude that Objector-Appellant March had waived his objections to the NAR Settlement by failing to appear in person.

## III. The District Court Erred By Holding that the Identical Factual Predicate Test Extinguished REBNY Manhattan Claims

In concluding that the New York City REBNY litigations share an identical factual predicate with the *Burnett* litigation, the District Court chose to ignore the numerous facts and judicial admissions evidencing that REBNY Manhattan operates in an entirely separate and distinct residential real estate environment. Manhattan REBNY class members sold residential real estate using different brokers and different brokerage firms under the auspices of an entirely separate and distinct real estate trade association that promulgated a materially distinguishable real estate commission sharing rule along with an entirely distinct code of ethics. The District Court's assertion that these immense variances amounted to "slight differences . . . between the relevant NAR and REBNY rules . . . which do not create a distinct factual predicate" ignores reality and does not make it true. *See* App. 1453-54, R.Doc. 1622, at 56-57, Add. 56-57.

A release in a class action settlement can only release claims if the released conduct arises out of the "identical factual predicate" as the claims at issue in the underlying litigation. *See, e.g. Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 377 (1996); William B. Rubenstein, *Newberg on Class Actions* § 18.19 (5th ed. 2018). Under the classic formulation of the "identical factual predicate" rule, a class action settlement release cannot foreclose claims "which depend not only upon a different legal theory but upon proof of further facts." *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 n.7 (2d Cir. 1981). A class action release, therefore, must be limited to claims "depending upon the very same set of facts" as the underlying class action. *Id.* This means that if "a judgment after trial cannot extinguish claims not asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either." *Id.* at 18.

The Second Circuit in *National Super Spuds*—one of the two leading cases regarding the identical factual predicate requirement—rejected a class action settlement precisely because the release in question required proof of further facts related to actions objectors did not take regarding potato futures. In that case, both the class representatives' and objector's claims stemmed from defendants' conduct in manipulating potato futures. The key difference was that the class representative settling plaintiffs "had liquidated their long contracts" whereas the objector put

forth claims "on behalf of persons who had not liquidated their contracts" for potato futures. *Id.* Had there been a judgment in the case rather than a settlement, "[s]uch a judgment would not have barred members of the class from bringing any other claim they might be able to assert against the defendants, including claims based on contracts unliquidated at the close of trading." *Id.*

Using much the same reasoning as *National Super Spuds*, the Second Circuit found an identical factual predicate and gave preclusive effect to a federal class action settlement in *TBK Partners, Ltd. v. Western Union Corp.*, the other leading case concerning the doctrine. That case involved a group of minority shareholders who disapproved of a merger price offered by Western Union and the valuation of the minority shareholders' shares. 675 F.2d 456, 458 (2d Cir. 1982). Objectors in *TBK Partners* did not assert that their claims involved a distinct set of facts from the class claims; rather, they contended that the federal class action settlement would extinguish their appraisal rights in New York State court; that the federal district court did not have the power to bar claims that could not have been brought in the federal class action; and that state appraisal rights are individual statutory rights inapposite for class adjudication. *Id.* at 456. The Second Circuit rejected objectors' arguments, affirmed the district court's decision approving the settlement, and held the lower court could "permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class

action even though the claim was not presented and might not have been presentable in the [federal] class action." *Id.* at 460. At bottom, "both the [federal] class action and the state court appraisal proceeding hinge[d] on the identical operative factual predicate: the correct valuation of whatever reversionary interest was owed to [the acquired company]'s shareholders." *Id.*

A somewhat varied formulation of the identical factual predicate doctrine asks whether or not the claims in question "aris[e] out of the same transaction and occurrence" as those litigated in the settled class action. 6 *Newberg and Rubenstein on Class Actions* § 18:19 (6th ed.). This "same transaction," "arising out of," or "common nucleus of fact" test constitutes the outer limits of what claims a class action settlement can extinguish—even settling defendants seeking wide ranging global releases have conceded this point. *See Matsushita Elec.*, 516 U.S. at 393-94 (1996) (Ginsburg, J., concurring in part and dissenting in part) (noting settling defendant who enforced class action release had "urged" the Ninth Circuit to adopt the "same transaction" . . . "test"). The same transaction formulation appears to be what the District Court utilized when it erroneously concluded that REBNY New York constituted an identical factual predicate as the *Burnett* litigation. *See* Final Approval Order at ¶ 118 ("The Court finds the challenged REBNY rules share a common nucleus of operative fact, and thus the same factual predicate, as Burnett."). App. 1453, R.Doc. 1622, at 56, Add. 56.

This Court—in *Thompson v. Edward D. Jones & Co.*, 992 F.2d 187 (8th Cir. 1993)—and almost every other sister circuit (aside from the Fifth and Tenth) has favorably cited one or both of the above rulings and utilized an identical factual predicate analysis when determining whether or not to grant a release in a class action settlement.[13] Affirming the decision of the District Court would thus fly in

---

[13] *See, e.g.*, *Nottingham Partners v. Trans-Lux Corp.*, 925 F.2d 29, 34 (1st Cir. 1991) (when federal law claims to be released stemmed from same nucleus of operative fact as the state law claims, the state court release could legitimately be used as a defense to the former in a federal venue); *City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1044 (1st Cir. 1996) ("[T]he derivative claims clearly arose from the same factual predicate as [Plaintiff]'s claims alleging misrepresentations and omissions in [Defendant]'s disclosure statements and breaches of [Defendant]'s fiduciary duties….All of these claims stemmed from problems with the tender offers and were releasable by the class action settlement."); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011) ("Any released claims not presented directly in the complaint, however, must be 'based on the identical factual predicate as that underlying the claims in the settled class action.'"); *Freeman v. MML Bay State Life Ins. Co.*, 445 F. App'x 577, 579 (3d Cir. 2011) ("The key inquiry is whether the factual predicate for future claims is identical to the factual predicate underlying the settlement agreement."); *Berry v. Schulman*, 807 F.3d 600, 616 (4th Cir. 2015) ("[P]arties may release not only the very claims raised in their cases, but also claims arising out of the 'identical factual predicate.'"); *Olden v. Gardner*, 294 F. App'x 210, 220 (6th Cir. 2008) ("Because such claims have an identical factual predicate as the claims pled in the complaint, no problem is posed by their release."); *Williams v. Gen. Elec. Cap. Auto Lease, Inc.*, 159 F.3d 266, 274 (7th Cir. 1998) (finding substantive claims [of subject lawsuit] "based on the identical factual predicate (the leases and the potential for an early termination penalty) as the disclosure claims that [7th Circuit] noted were properly before the [district] court"); *Thompson*, 992 F.2d at 191 (appellant objector's claims rested on same or similar facts as the settled class action); *Hesse v. Sprint Corp.*, 598 F.3d 581, 591 (9th Cir. 2010) ("The superficial similarity between the two class actions is insufficient to justify the release of the later claims by the settlement of the former.

the face of countless well-reasoned precedents. Equally significant, it would deprive Manhattan REBNY class members from having their day in court.

Here it is abundantly clear that Objector-Appellant March alleges an ***entirely different*** conspiracy that does not involve an identical factual predicate with the claims of the NAR class. REBNY ***is not*** a party in any real estate commission litigation outside of New York City and NAR ***is not*** a party in any of the REBNY New York litigations. REBNY separated itself entirely from NAR in 1994, prior to NAR's adoption of the commission-sharing rules at issue. Not only does REBNY see itself as an entirely distinct real estate trade association, but NAR conceded that point at the class certification stage in *Moehrl* when it emphasized REBNY RLS is a service "unaffiliated with NAR and that serves the New York City area." App. 576, R.Doc. 1560-2, at 16.

Only when REBNY and NAR were entirely separate entities did they adopt and implement their different residential real estate commission sharing rules and

---

Both involve claims that [Defendant] improperly billed government taxes or fees to its customers, but they deal with different surcharges, imposed to recoup different costs, that were alleged to be improper for different reasons."); *Thomas v. Blue Cross & Blue Shield Ass'n*, 333 F. App'x 414, 419 (11th Cir. 2009) (finding appellant's counterclaims against Blue Cross Blue Shield of North Carolina were properly released by district court since appellant's "counterclaims and the [class] action, both of which arise out of Blue Cross' conniving to deny, diminish, or delay payment for covered service based on cost instead of medical necessity, share the same operative nucleus of fact").

because of this both respective commission sharing rules materially differ and the mechanism for ensuring rule compliance varies. REBNY's counsel correctly noted that, "[t]he rule at the heart of the REBNY action, Article 4, Section 1, is not a mandatory offer of compensation rule. It doesn't require an offer of compensation to list." App. 943, R.Doc. 1562-4, at 30. That makes it materially distinguishable from NAR's commission sharing rule which requires an offer of compensation in order to list on the MLS. Moreover, unlike NAR's rule which required some unspecified commission share, REBNY's commission sharing rule explicitly called for the buyer-broker and seller-broker to share the commission ***equally***. App. 695, R.Doc. 1562-2, at 19.

Many REBNY Manhattan Defendants recognize that these respective commission sharing rules differ. REBNY told the JPML that "*March* is premised upon a specific REBNY rule that materially differs from the NAR Rules, NAR Handbook and Code of Ethics at issue in the other cases . . . " App. 958, R.Doc. 1562-5, at 4. REBNY also propounded that "[t]he NAR cases, including the *Burnett* and *Moehrl* cases . . . are premised entirely upon NAR's Rules, the NAR Handbook and NAR's Code of Ethics – all of which REBNY and RLS deliberately never adopted and do not follow." App. 956, R.Doc. 1562-5, at 2. Brown Harris Stevens Residential Sales, LLC similarly submitted to the JPML that the "NAR rule—and the functional equivalent which was adopted by the remaining MLSs—



Appellate Case: 24-3450 Page: 42 Date Filed: 05/16/2025 Entry ID: 5517561

is the gravamen of the NAR actions and *does not* appear in any form in REBNY's rules." App. 1294, R.Doc. 1562-10, at 5.

Aside from having distinguishable rules, both the REBNY broker commission conspiracy and the NAR conspiracy were carried out in fundamentally different ways. REBNY's inflated buyer-broker commission rates were effectuated by requiring individual agents and brokers to accede in writing to abide by REBNY's Rules and Code of Ethics as a condition precedent to transacting on the RLS. *See* App. 536, R. Doc. 1560, at 6 In sharp contrast, outside the REBNY New York system, residential real estate commissions were fixed through NAR member brokers' policies and conduct at the corporate level which enforced the NAR rules on NAR MLS's at the broker/agent level. *Id.*; *see also supra* at 6-7.

As Plaintiff-Appellees argued to this court, the nationwide NAR-centric "conspiracy worked because [Defendants] required their franchisees and affiliates to belong to NAR and follow its rules. Defendants also trained their franchisees and affiliates to make offers of buyer compensation, usually at a particular level." Brief of Plaintiff-Appellees at 53, *Burnett et al. v. NAR et al.*, Nos. 24-2143, 24-2168, 24-2391 (8th Cir. Dec. 11, 2024). These methods of implementation are not the same.

Because of all these differences, REBNY specific discovery and additional evidence would be required to prove REBNY Manhattan class claims. The fact that

NAR's real estate commission allocation rules; Code of Ethics; and nationwide conspiracy are found violative of the federal antitrust laws would have no preclusive effect on the REBNY claims. That is because REBNY had different rules and a different code of ethics which were implemented at a time when REBNY was entirely separate and distinct from NAR. Additionally, REBNY decided to effectuate its commission sharing rules in a different way—which was through individual agents and brokers being required to accede in writing to abide by the REBNY's Rules and Code of Ethics as a condition precedent to transacting on the RLS.

It also bears mentioning that the majority of defendants in the REBNY litigations differ from the Defendants in *Burnett* litigation and any overlapping Defendants would have had to adhere to the different REBNY rules when transacting on the RLS. For these reasons, discovery in REBNY will have nothing to do with the NAR litigations. Counsel for REBNY correctly emphasized to the JPML, "[t]here are no common facts and there's going to be no common discovery with respect to the [REBNY] New York actions. App. 942, R.Doc. 1562-4, at 29. REBNY's counsel went on to note, "[f]or example, any discovery relating to the history of the NAR rules, the passage of the NAR rules, the compliance and enforcement of the NAR rules is completely irrelevant to the REBNY cases." *Id.*

Moreover, "the passage of the REBNY rules, the enforcement and compliance with the REBNY rules, [are] also completely irrelevant to the NAR cases." *Id.*

A cornerstone of the identical factual predicate doctrine is that when proof of further facts is required, a claim cannot be released. *See, e.g. Dennis v. JPMorgan Chase & Co.*, 2021 WL 1893988, at *5 (S.D.N.Y. May 11, 2021) ("Claims that rely 'upon proof of further facts,' . . . cannot be released." (quoting *TBK Partners*, 675 F.2d at 462)). To that point, *Dennis* and *In re Auction House Antitrust Litigation* are both apposite and instructive.

The Court in *Dennis* found "the factual predicates for plaintiffs' claims . . . and the claims settled in [the nationwide class action settlement] are far from identical." 2021 WL 1893988, at *6. There, Plaintiffs claims pertained to alleged manipulation of BBSW—"a benchmark interest rate designed to measure the cost of borrowing Australian dollars." *Id.* at *2. By contrast, the claims undergirding the settled class action were that defendants manipulated different benchmark foreign exchange rates to favor their trading position. *Id.* at *3. While superficially similar conspiracies, the two actions:

> relate to the alleged manipulation of two distinct and unrelated benchmark rates. BBSW is a benchmark *interest* rate that is intended to reflect the observed interest rate on prime bank bills traded in the Australian money market. It is administered by the AFMA in Australia. The 'Fixes' at issue in the FX litigation were benchmark *foreign exchange* rates that were intended to reflect the observed FX rates on spot transactions traded globally. They were set by entities such as W/M Reuters and the European Central Bank."

*Id.* (footnote call numbers omitted). Furthermore, the two actions "allege[d] that defendants manipulated these distinct rates in entirely different ways." *Id.* at *6. While one action alleged the relevant rate was manipulated by defendants "engaging in manipulative prime bank bill transactions . . . [through] sharing proprietary information regarding 'BBSW-Based Derivatives' positions in a chatroom called 'BBSW rate set,' [in addition to] making false BBSW submissions in violation of AFMA guidelines, and using their control over the AFMA rule-making process to ensure that BBSW remained susceptible to manipulation," *id.*, the other litigation involved "defendants – primarily through traders based [in] London – allegedly manipulat[ing] the Fixes by, among other things, sharing inappropriate market-sensitive information in chatrooms . . . in advance of the fixing window for WM/Reuters Closing Spot Rates." *Id.* Because of these factual differences, "[w]ere the two cases to proceed to trial, establishing these disparate schemes would require proof of an entirely separate set of facts." *Id.* Similarly, in *In re Auction House Antitrust Litigation*, a group of subsequent litigants "sought to recover damages under the United States antitrust laws and customary international law on behalf of a class of person who bought or sold works of art through Christie's and Sotheby's at non-internet auctions held *outside* the United States." *In re Auction Houses Antitrust Litig.*, 2001 WL 170792, at *2 (S.D.N.Y. Feb. 22, 2001), *aff'd*, 42 F. App'x 511 (2d Cir. 2002). The plaintiffs and the auction house

defendants in the earlier domestic antitrust litigation sought to bind those foreign auction plaintiffs to the settlement of the domestic class action. The Court, however, rejected this effort, finding that the subsequent foreign litigations and the settled domestic litigation "do not rest upon 'the identical factual predicate.'" *See id. at* *13 n.69. Class members asserting claims regarding *foreign auctions* would have to prove additional facts demonstrating that the effects of the *Auction House* conspiracy impacted the *foreign auction market*. *See id.*

No facts cited nor any analysis done in the District Court's Final Approval Order shows that there is indeed a common factual predicate between the REBNY New York actions and *Burnett*. The first cited fact—that any released entity by definition has a NAR affiliation proves too much. To qualify for release pursuant to the NAR Settlement all a brokerage needed was a single NAR member as a principal. This does not make the brokerage NAR affiliated. By the same token, if a REBNY member was a principal in a brokerage operating entirely outside New York City that would not make that brokerage REBNY affiliated. Brokerages can be constituted of thousands of individuals and one single person being part of NAR does not make that brokerage become a NAR affiliate.

Similarly, the fact that the Amended *Gibson* Complaint contains a passing reference to REBNY RLS is of no moment and does not show that the REBNY and NAR litigations share a factual predicate. The cited provision of the Amended

*Gibson* Complaint included REBNY RLS in a bullet-pointed list of MLSs that it inaccurately characterized as "nevertheless controlled by REALTOR associations and/or NAR brokerages and are not fully independent from NAR . . . these MLS and their participating brokerage are generally subject to the same or similar anticompetitive restraints including because: (i) all realtor members of non-NAR MLSs are subject to NAR's Code of Ethics; and (2) each non-NAR MLS has adopted the same or similar anticompetitive restraints as those imposed by NAR on its affiliated MLS." *See* App. 1450, R.Doc. 1622, at 53, Add. While that may be true of other NAR-affiliated MLSs, it is not true of REBNY's. REBNY RLS is fully independent and has nothing to do with NAR, the NAR Code of Ethics do not apply in REBNY New York, and the participating brokerages on the RLS are not subject to the same or similar rule.

It is also worth mentioning that the Amended *Gibson* Complaint was filed on June 11, 2024. This was: (i) ***after*** the trial and jury verdict in *Burnett*, (ii) ***after*** both March and Friedman filed their New York REBNY actions; (iii) and ***after*** the nationwide Settlements with national brokerage firms and NAR were reached. Prior to that belated amendment, there had been no reference whatsoever to REBNY in the NAR litigation. It would be manifestly inequitable to accept the threadbare reference to REBNY RLS as proof of NAR affiliation when Plaintiff-

Appellees have had years to make that allegation and only asserted that connection after they had penned a nationwide Settlement with NAR.

Nor does the District Court's citation to the Amended *Gibson* Complaint's allegations that the NAR conspiracy had nationwide effects make REBNY part of the same factual predicate. REBNY and NAR had different commission compensation rules, applicable to different real estate transactions, that *each* made home sellers pay inflated buyer broker commissions. It is plain legal error to presume that similar effects stemming from differing conspiracies constitute an identical factual predict. *See In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 118-20 (S.D.N.Y. 2010) (separate antirust conspiracies about similar subject matter do not share identical factual predicate because "the agreement itself, not its performance, is the crime of conspiracy").

The Districts Court's decision to ignore ***all*** prior judicial admissions made before the JPML regarding a lack of an identical factual predicate between *Burnett* and the REBNY litigations was an abuse of discretion. As mentioned above, REBNY Manhattan Defendants—the entities most knowledgeable about the unique intricacies of Manhattan residential real estate transactions as well as the distinct rules and regulations required by REBNY—vociferously argued there was no identical factual predicate between REBNY and the NAR-based litigations in the Western District of Missouri. These admissions that the cases involve different

factual predicates are not overcome by the District Court's citation to one line from March's initial complaint which referenced the fact that both NAR and REBNY rules "mandate[] the payment of commission by a Seller Broker to a Buyer Broker," and characterized the two requirements as "in effect, the same rule." *See* App. 1451, R.Doc. 1622, at 54, Add. 54. That one line from March's initial complaint merely analogizes REBNY's anticompetitive real estate commission rule to NAR's, which was already the subject of litigation. Nothing more.

Lastly, the District Court was mistaken in its conclusion that the "evidentiary record in *Burnett* and *Moehrl* reflect that the challenged NAR rules applied nationwide, including to transactions in REBNY RLS." *See* App. 1450-51, R.Doc. 1622, at 53-54, Add. 53-54. As discussed above, the NAR rules do not apply to REBNY residential real estate transactions. Moreover, two distinct rules can be anticompetitive in similar ways and yet stem from two different conspiracies and thus not constitute an identical factual predicate. *See In re Currency Conversion Fee*, 264 F.R.D. at 118-20. As noted extensively throughout this brief, REBNY separated from NAR three decades ago; REBNY decided not to implement NAR rules and regulations and decided to craft its own rules and regulations; REBNY's rules and regulations materially differed from NAR's; and the means by which REBNY enforced compliance with its real estate broker

commission rule drastically differed from how NAR enforced compliance with its conspiracy.

The District Court's purported evidence does not change the operative reality that REBNY and NAR operated entirely separately from each other. The Expert Report of Craig Schulman ***does not*** prove the existence of a factual predicate because his unsubstantiated claim that Realtors operating in non-NAR MLS jurisdictions "remain obligated to compensate the buyer's agent per the NAR Code of ethics" is flat wrong. App. 1451-53, R.Doc. 1622, at 54-56, Add. 54-56. When transacting on the REBNY RLS members are required to follow REBNY Rules and Regulations because REBNY has consciously chosen not to adopt the NAR Code of Ethics. Moreover, an examination of the next cited authority, the Expert Class Certification Rebuttal Report of Professor Einer Elhauge at ¶ 67, does not demonstrate an identical factual predicate between the NAR cases and the REBNY cases. *Moehrl v. Nat'l Assn. of Realtors,* 19-cv-1610 ) (Doc. #372) (N.D.Ill. Oct. 18, 2022), App. 1452-53, R.Doc. 1622, at 55-56, Add. 55-56. Rather, Professor Elhauge was dismissing a defense expert's opinion that the REBNY rules provided an appropriate benchmark to assess injury and damages caused by the NAR rules. *Id.* at ¶26 (defense expert "is wrong that any of these four U.S. listing services provide good but-for benchmarks"). Indeed Professor Elhauge opined that the REBNY rules were even more anticompetitive than the NAR rules.

*Id.* at ¶68. Professor Elhauge's initial report confirms that REBNY and its RLS *were not* considered to be one of the multitude of independent MLS's that were similar enough to NAR MLS's to deserve scrutiny and analysis. App. 1199-1218, R.Doc. 1562-6, at 231-50. And this is for good reason. In looking at which characteristics defined a non-NAR MLS as "not fully independent from NAR", Professor Elhauge enumerated five factors: "(i) partial MLS ownership by Realtor associations; (ii) MLS rules restricting ownership to brokers that are NAR members (i.e. Realtors); (iii) MLS rules limiting members to NAR members (i.e., Realtors); (iv) MLS executive participation on NAR's MLS rulemaking bodies; and/or (v) MLS rules expressly adopting or incorporating NAR's Code of Ethics, NAR's MLS Handbook, and other NAR policies." App. 1201, R.Doc. 1562-6, at 233. None of these *indicia* (reflecting a lack of independence from NAR) apply to REBNY or the REBNY RLS.

In sum, none of the evidence cited by the Court evidences a common factual predicate between the REBNY New York lawsuits and the *Burnett* litigation. Thus, the District Court clearly erred in ruling the claims in the March litigation shared an identical factual predicate with that of the *Burnett* litigation and, therefore, that the *March* plaintiffs could be bound by the national NAR settlement agreement.

## CONCLUSION

For the foregoing reasons, Objector-Appellant Monty March respectfully requests that this Court reverse the District Court's decision to deny Mr. March's objection because of his inability to personally appear at the Fairness Hearing. Objector-Appellant also respectfully requests the reversal of the District Court's release of his Manhattan REBNY class claims. The District Court erred in finding the existence of an identical factual predicate between March's REBNY Manhattan litigation and *Burnett* since it failed to consider all relevant facts in applying the doctrine.

Dated: April 21, 2025

Respectfully submitted,

By: */s/ Louis M. Bograd*
Louis M. Bograd
**MOTLEY RICE LLC**
401 9th St. NW, Suite 630
Washington, DC 20004
Telephone: (202) 386-9623
lbograd@motleyrice.com

Michael M. Buchman
Nathaniel Blakney
**MOTLEY RICE LLC**
800 Third Avenue, Suite 2401
New York, New York 10022
Telephone: (212) 577-0040
mbuchman@motleyrice.com
nblakney@motleyrice.com

Marvin A. Miller
Matthew E. Van Tine
**MILLER LAW LLC**
53 W. Jackson Blvd., Suite 1320
Chicago, Illinois 60604
Telephone: (312) 332-3400
MMiller@millerlawllc.com
MVantine@millerlawllc.com

*Counsel for Objector-Appellant Monty March*

## CERTIFICATE OF COMPLIANCE

The undersigned attorney for Objector-Appellant Monty March certifies this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a). The brief contains 11,536 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 Version 2502 in fourteen (14) point Times New Roman font. The undersigned attorney also certifies, pursuant to Circuit Rule 28A(h)(2), that the brief has been scanned for viruses and, to the best of our ability and technology, believes it is virus free.

Dated: May 5, 2025

*/s/ Louis M. Bograd*

By: Louis M. Bograd

Attorney for Objector-Appellant
Monty March

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney for Objector-Appellant Monty March certifies that on May 5, 2025, an electronic copy of the Brief of Objector-Appellant was filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: May 5, 2025

*<u>/s/ Louis M. Bograd</u>*

By: Louis M. Bograd

Attorney for Objector-Appellant
Monty March